# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

TERRELL THORNTON,

        Defendant-Appellant.

UNPUBLISHED
December 29, 2016

No. 327669
Wayne Circuit Court
LC No. 12-004642-01-FC

Before: GADOLA, P.J., and FORT HOOD and RIORDAN, JJ.

PER CURIAM.

In 2012, a jury convicted defendant of attempted murder, MCL 750.91, and arson of a dwelling house, MCL 750.72(1)(a). In a prior appeal, this Court vacated defendant's convictions and remanded for a new trial because it agreed with the trial court that defense counsel provided ineffective assistance when he failed to investigate an alibi defense. *People v Thornton*, unpublished opinion per curiam of the Court of Appeals, issued May 27, 2014 (Docket No. 313070). Defendant was retried in November 2014 and again convicted of attempted murder and arson of a dwelling house. He was sentenced to 25 to 50 years in prison for the attempted murder conviction and 10 to 20 years in prison for the arson conviction, to be served concurrently.

Defendant again appeals as of right. We affirm.

## I. FACTUAL BACKGROUND

Defendant's convictions arise from a fire at a Detroit apartment building on Springle Street in the early evening on August 9, 2011. Investigators concluded that the fire was an arson, discovering that accelerants were used inside the building, near the exit. No one died in the fire, but many individuals escaped from the building through apartment windows and suffered various injuries.

The prosecution's theory of the case was that defendant attempted to murder Jeffrey White because White had renounced a Nation of Islam group that defendant led. There was testimony that defendant threatened White in the past and threatened him again from inside a van or SUV, with two other men inside, in front of the apartment building shortly before the fire. Numerous witnesses testified regarding their observations before, during, and after the incident.

-1-

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that defense counsel provided ineffective assistance at the second trial by failing to investigate and present an alibi defense and failing to adequately impeach two of the prosecution's witnesses. We disagree.

## A. STANDARD OF REVIEW

Because a *Ginther*[1] hearing was not held in the trial court following defendant's second trial, our review is limited to errors apparent on the record. *People v Jordan*, 275 Mich App 659, 667; 739 NW2d 706 (2007). "A claim of ineffective assistance of counsel is a mixed question of law and fact. A trial court's findings of fact, if any, are reviewed for clear error, and this Court reviews the ultimate constitutional issue arising from an ineffective assistance of counsel claim de novo." *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008), citing *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002).

> Effective assistance of counsel is presumed, and defendant bears a heavy burden of proving otherwise. To demonstrate ineffective assistance, defendant must show: (1) that his attorney's performance fell below an objective standard of reasonableness, and (2) that this performance so prejudiced him that he was deprived of a fair trial. To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. [*People v Gaines*, 306 Mich App 289, 300; 856 NW2d 222 (2014) (quotation marks and citations omitted).]

## B. ALIBI DEFENSE

Defendant first claims that defense counsel was ineffective for failing to investigate and present an alibi defense. We disagree.

Defendant raised this argument in his prior appeal, claiming that his former defense attorney was also ineffective for failing to investigate an alibi defense. *Thornton*, unpub op at 2. This Court agreed and remanded the case for a new trial. *Id*. at 3-4. However, the record developed after remand does not support defendant's contention that his newly appointed defense counsel failed to investigate an alibi defense.

Before defendant's second trial, defense counsel filed a notice of intent to claim an alibi defense, identifying four witnesses who may offer testimony that defendant was on Olga Street in Detroit, Michigan, at the time of the offense. During the retrial, however, defense counsel and defendant stated the following on the record:

> *[Defense counsel]*: Secondly, we have filed a notice of intent to claim the defense of alibi. After reviewing[,] considering[,] and weighing all the pros and

---

[1] *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973).

cons, it is also our decision, in consultation with [defendant], that we not raise the alibi defense.

Am I right, [defendant]?

*DEFENDANT*: That is correct, sir.

* * *

*[Defense Counsel]*: Anybody promise anything threaten coerce you in any weapon [sic] to make these decisions we just talked about put on the record.

*DEFENDANT*: No sir.

Defendant asserts on appeal that he only agreed to abandon the alibi defense because counsel was unprepared at retrial to present that theory, but this claim is inconsistent with defendant's own statements on the record that he was not coerced into abandoning the alibi defense. Further, unlike defendant's first attorney, who failed to investigate the defense, defendant's new counsel stated that he and defendant had reviewed, considered, and weighed all the pros and cons of presenting an alibi defense, and defendant expressly confirmed on the record that he agreed with that statement.

Given this evidence, defendant has not overcome the strong presumption that the decision not to present the alibi defense was sound trial strategy, see *Gaines*, 306 Mich App at 300, as defendant's wholly unsupported claim that counsel was unprepared is insufficient to rebut the record evidence confirming that counsel investigated the defense and made an informed decision not to present it.[2]

Defendant has failed to establish that he received ineffective assistance on this ground.

## C. IMPEACHMENT

Next, defendant argues that counsel was ineffective because counsel did not use several pieces of evidence to impeach White and Myra Owens, a resident of the apartment complex. Defendant argues that this error is egregious in light of the fact that their credibility was critical in this case because they were the only witnesses who saw defendant with a gas can. We reject defendant's claim.

"Counsel may provide ineffective assistance if counsel unreasonably fails to develop the defendant's defenses by adequately impeaching the witnesses against the defendant." *People v*

---

[2] Again, our review is limited to *errors apparent on the record*. See *Jordan*, 275 Mich App at 667. We may not consider the affidavits proffered by defendant on appeal, as doing so would constitute an impermissible expansion of the record. See *People v Powell*, 235 Mich App 557, 561 n 4; 599 NW2d 499 (1999).

*Lane*, 308 Mich App 38, 68; 862 NW2d 446 (2014). However, "[d]ecisions regarding whether to call or question a witness are presumed to be matters of trial strategy." *People v Putman*, 309 Mich App 240, 248; 870 NW2d 593 (2015). "We will not substitute our judgment for that of defendant's counsel, nor will we use the benefit of hindsight to assess counsel's performance." *People v Unger*, 278 Mich App 210, 258; 749 NW2d 272 (2008). "A particular strategy does not constitute ineffective assistance of counsel simply because it does not work." *People v Matuszak*, 263 Mich App 42, 61; 687 NW2d 342 (2004).

First, prosecution witness White testified that he was approaching the apartment building to visit his soon-to-be mother-in-law, Brenda Andrews, when an SUV driven by defendant approached him. Defendant spoke to White, and a man in the backseat of the vehicle cocked a gun during the encounter. Defendant argues that counsel should have cross-examined White and the reporting officer about White's statement to the police that the encounter actually occurred as he was leaving the apartment building. At the first trial, former defense counsel elicited testimony from Officer Anthony Murray that White told him that he saw defendant as he walked out of the building. When prior counsel asked White about the police statement, he explained that he talked to a lot of officers, he denied that he explained the encounter as it was written in the report, and he noted that he did not write the statement himself.

Defendant cannot establish that his new attorney unreasonably failed to develop defendant's defenses by failing to impeach White with his previous statement to the police. The record shows that, in the alternative, defendant's new counsel elicited testimony from White that he was not sure, in some instances, what he told the police, and that it is possible that he did not mention seeing defendant with a gas can until about a year after the fire. Counsel also elicited testimony from White that he had a cellular phone, but did not personally call the police after he was threatened outside the apartment building. In addition, counsel questioned whether White was just after a Crime Stoppers' reward in this case.

Counsel also pursued other theories to impeach White's credibility. To attack the theory that defendant targeted White for leaving the Nation of Islam, counsel elicited testimony from White that he did not call the police when defendant had threatened him in the past and that he failed to obtain a personal protection order. In addition, as discussed further below, counsel attempted to establish that White blamed defendant in order to avoid being investigated as the true perpetrator of the arson. For example, counsel offered other-acts evidence establishing that White had lied in the past by using an alias. Defense counsel also elicited testimony that White smoked marijuana, and that it was not uncommon for him to carry a lighter. Moreover, counsel questioned White regarding whether he told medical professionals that he *burned himself*, indicating that the fire occurred due to his own acts. Additionally, counsel elicited testimony that White could have been described as "stocky" at the time of the fire, and that Owens described the perpetrator as "stocky." The defense also evoked testimony that White was familiar with the general layout of the building and that he had a friend drop him off a distance away, from which a jury could infer that his behavior was suspicious and not simply a visit to his future mother-in-law. On this record, given defense counsel's attempted impeachment of White through numerous other means, defendant has failed to demonstrate that defense counsel's decision not to impeach White with one prior inconsistent statement from a police report was an unsound trial strategy. See *Putman*, 309 Mich App at 248; *Lane*, 308 Mich App at 68

In addition, defendant argues that counsel should have impeached Owens with her prior police statement that the perpetrator was wearing a black t-shirt on the day of the fire. Defendant fails to recognize that counsel established through cross-examination that Owens was confused about the perpetrator's clothing. He elicited from Owens that she thought that she saw defendant wearing a white t-shirt when he entered the apartment building, but was wearing a blue t-shirt when he left. Defendant cannot establish that counsel's strategy fell below an objective standard of reasonableness on this basis. See *Gaines*, 306 Mich App at 300.

Defendant also argues that counsel should have impeached Owens with her prior testimony that defendant arrived around 9:00 a.m. when she repeatedly testified on cross-examination at the second trial that she was not sure when he arrived. However, defense counsel elicited testimony from Owens that she could not remember the time at which defendant arrived, and counsel may have believed, in a reasonable exercise of trial strategy, that leaving this testimony untouched would generate more doubt in the minds of the jurors than impeaching Owens with a prior inconsistent statement that specifically identified the timing of the day's events. See *Putman*, 309 Mich App at 248. Further, while defendant claims that establishing that Owens saw him earlier in the day would contradict the other witnesses' testimony—which placed defendant at the apartment building only at the time of the fire—to such an extent that the jury would find her testimony unbelievable, Owens was the only witness to testify that she spent the whole day looking out the window at Springle Street. Therefore, she was the only witness with an opportunity to see defendant earlier in the day. Further, as the prosecution argues, focusing on Owens' testimony that defendant was at the apartment the whole day may have increased the risk that the jury would believe her testimony that defendant wore two different shirts and had time to change, as she claimed.

Most importantly, counsel pursued alternative methods to impeach Owens' credibility. Counsel elicited testimony that: (1) she thought that defendant's vehicle was green while other witnesses testified that it was silver or white; (2) she could not remember any additional details about the other men in the vehicle besides their race; (3) she only reported her observations to the authorities when officers visited her months after the fire; and (4) she did not know defendant's height or hairstyle and testified that he did not have any facial hair. Given this vigorous cross-examination, defendant cannot establish that counsel unreasonably failed to develop the defense that Owens' observations were not credible. See *Gaines*, 306 Mich App at 300.

Lastly, it is noteworthy, in the words of the prosecutor at the *Ginther* hearing after the first trial, that defendant's former counsel was "almost overly aggressive" in his cross-examination of the witnesses, and he made—or at least attempted to make—"mincemeat" out of Owens. It is apparent that this aggressive cross-examination strategy was not successful during the first trial, and the same lines of questioning that defendant claims that his new counsel should have pursued while cross-examining White and Owens were, in fact, pursued by his former counsel in the first trial, which resulted in defendant's conviction.

Accordingly, we conclude that defendant has failed to establish the requisite prejudice to substantiate his ineffective assistance claims. See *Gaines*, 306 Mich App at 300. Moreover, given this record, defendant cannot overcome the strong presumption that, on retrial, his new counsel made a strategic decision to strike a careful balance between impeachment and bullying. "That the strategy [defense counsel] chose ultimately failed does not constitute ineffective

assistance of counsel." *People v Kevorkian*, 248 Mich App 373, 414-415; 639 NW2d 291 (2001).

### III. MOTION TO SUPPRESS OWENS' IDENTIFICATION

Next, defendant argues that the trial court should have granted his motion to suppress Owens' in-court identification. We disagree.

### A. STANDARD OF REVIEW

"A trial court's determination in a suppression hearing regarding the admission of identification evidence will generally not be reversed unless clearly erroneous. Issues of law relevant to a motion to suppress are reviewed de novo. Clear error exists when the reviewing court is left with a definite and firm conviction that a mistake was made." *People v McDade*, 301 Mich App 343, 356; 836 NW2d 266 (2013).

### B. ANALYSIS

In the trial court, the parties stipulated that the prosecution may not present evidence of Owens' identification of defendant in a photographic lineup at a time when defendant was already in custody, as using a photographic lineup at that time was improper. See *People v Kurylczyk*, 443 Mich 289, 298; 505 NW2d 528 (1993) ("Subject to certain exceptions, identification by photograph should not be used where the accused is in custody.") (quotation marks, citation, and emphasis omitted). In general, if a witness identifies a defendant through an improper pretrial identification procedure, the prosecution must establish an independent basis for any subsequent in-court identification of the defendant by that witness. See *People v Kachar*, 400 Mich 78, 92-94; 252 NW2d 807 (1977). Courts should consider the following factors when determining whether an independent basis exists for the admission of an in-court identification: (1) the witness's prior knowledge of the defendant, (2) the witness's opportunity to observe the perpetrator during the crime (including the duration of the observation, the lighting, any noise or other factors affecting sensory perception, and the proximity to the alleged criminal act), (3) the length of time between the crime and the disputed identification, (4) discrepancies between the pretrial identification description and the defendant's actual appearance, (5) any prior proper identification or failure to identify the defendant, (6) any prior identification of another as the perpetrator, (7) the mental state of the witness at the time of the crime (considering factors such as fatigue, nervous exhaustion, intoxication, and the age and intelligence of the witness), and (8) any special features of the defendant. *People v Gray*, 457 Mich 107, 116; 577 NW2d 92 (1998), quoting *Kachar*, 400 Mich at 95-96. Courts will also consider the witness's level of certainty at the prior identification. See *Kurylczyk*, 443 Mich at 306; *People v Colon*, 233 Mich App 295, 304-305; 591 NW2d 692 (1998). The inquiry focuses on the totality of the circumstances. *Gray*, 457 Mich at 115.[3]

---

[3] On appeal, defendant argues that the trial court misapplied controlling law by failing to determine if Owens had an independent basis for her in-court identification before concluding

The trial court properly admitted Owens' in-court identification of defendant, as it is clear from the record that Owens had an independent basis for the identification that was untainted by the improper pretrial procedure.[4] Multiple factors support this conclusion.

First, the testimony at the first trial demonstrated that Owens had an extended opportunity to observe defendant. Owens lived in the first-floor apartment in the front of the building. Owens testified that she had nothing to do on the day of the fire—which began as a rainy day but grew more pleasant as the hours passed—so she sat in a chair and looked out her front window. Thus, she had an opportunity to observe defendant repeatedly, in daylight, when he first arrived and entered the building, when he left after Owens heard an argument between two men, and again, closer to 6:00 p.m., when he exited the building with a gas can. As the prosecutor emphasized at the motion hearing, defendant was only a short distance away from where Owens was watching when he entered and exited the building. Moreover, as defendant ran with the gas can toward Warren Avenue, Owens kept her eyes on him for about half a block.[5] Owens'

---

that the fact that her identification occurred months after the fire was relevant to the weight, and not the admissibility, of her in-court identification. The trial court did not expressly restate the *Kachar* "independent basis" standard when it admitted the in-court identification, but it is overwhelmingly apparent from the parties' arguments and the trial court's questions on the record that the court understood that this standard was at issue.

[4] Defendant argues that the trial court erred by failing to hold an evidentiary hearing to review Owens' testimony outside the presence of the jury, and that we should remand for such a hearing. Defendant relies on *Gray*, which stated that an evidentiary hearing is required if counsel was not present at the pretrial identification or if the pretrial identification procedures were unnecessarily suggestive or conductive to irreparable misidentification. *Gray*, 457 Mich at 115, quoting *People v Anderson*, 389 Mich 155, 169; 205 NW2d 461 (1973), overruled in part on other grounds *People v Hickman*, 470 Mich 602, 603; 684 NW2d 267 (2004). Here, however, defendant did not contest Owens' pretrial identification or in-court identification based on those types of circumstances. Further, in *Anderson*, 389 Mich at 169, the Supreme Court explained, "*If the record is not complete* and a determination either way cannot be made, the court should vacate the conviction and remand to the trial court for a hearing on the issue." (Emphasis added.) Most notably, in *People v Johnson*, 202 Mich App 281, 287; 508 NW2d 509 (1993), this Court explained, "We do not believe that a defendant is entitled to an evidentiary hearing where the defendant fails to support the allegation of impropriety with factual support or where *it is clear from the record that such a hearing would be futile in light of substantial evidence that there exists an independent basis for the identification*." (Emphasis added.)

We agree with the prosecution that the record was more than sufficient to decide the issue at the time of the pretrial motion to suppress because Owens already had testified at the first trial. Although defendant claims that certain facts were not presented to the trial court when it considered the motion to suppress, the trial court stated that it took judicial notice of the entire record from the earlier trial. Accordingly, an evidentiary hearing was not necessary, and remand for an evidentiary hearing is not warranted.

[5] Defendant attempts to undermine Owens' testimony that she saw defendant throughout the day by arguing that other witnesses only saw him at the apartment building at the time of the fire. However, again, Owens was the only witness to testify that she spent the whole day looking out

opportunity to observe defendant weighed in favor of finding an independent basis for the in-court identification.

The record at the first trial demonstrated that Owens' description to police was corroborated by other witnesses' accounts and defendant's actual appearance. Defendant is a 5'4" black man who, according to the lower court file, weighed 140 pounds. Owens accurately told the police that defendant was short, with a heavyset or medium build, and was "dark complected." Owens estimated that defendant was between 20 and 30 years old, and he was 32 years old at the time of the fire. Owens reportedly saw defendant in different clothing throughout the day, but suspected that he had changed. Just like several other witnesses, Owens saw defendant exit a van or SUV with out-of-state plates.[6]

Additionally, Owens' confidence in the identification, her previous identification of defendant, and the fact that she never identified anyone else as the perpetrator further weigh in favor of finding that an independent basis existed for the in-court identification. Owens confirmed at the first trial that she was 100 percent certain of her identification, stating that there was "no doubt" in her mind. Additionally, when she viewed the photographic array, which nobody argues was inherently suggestive (only conducted at an improper time when defendant could have participated in a live lineup), she positively identified defendant. There is no evidence that Owens ever identified someone other than defendant as the perpetrator.

Because Owens had an opportunity to observe defendant before the fire, there is no indication that her identification was impaired by fear or other emotions related to the fire. Moreover, Owens testified that because she did not know defendant, she had no biases against him. Although defense counsel argued at the motion hearing that Owens was "in advanced years," she was only in her mid-50s when the fire occurred, and there is no evidence that her age affected her observations. Thus, Owens' mental state weighed in favor of finding an independent basis for the in-court identification.

Some factors weighed against a finding of an independent basis. Owens did not know defendant and had never seen him before the day of the fire. In addition, Owens' initial statement to the police and identification of defendant occurred months after the fire. However, the prosecutor explained that the delay occurred because Owens sought medical treatment on the day of the fire and the investigation of witnesses was stalled due to the fact that the witnesses were displaced from the gutted apartment building. And, again, even though Owens had not

the window at Springle Street. Thus, she was the only witness who had an opportunity to see defendant earlier.

[6] On appeal, defendant focuses on one discrepancy between Owens' report and testimony—she did not tell the police that she saw defendant with a gas can. She first mentioned this observation at the first trial. On cross-examination at the first trial, Owens acknowledged the discrepancy and, in the same line of questioning, admitted that she heard White talking about the case. But on redirect examination, Owens testified that White did not tell her what to say at trial and she confirmed that her testimony consisted of what she saw "with [her] own eyes." Despite Owens' omission, the overall consistency of Owens' reporting of defendant's appearance and the crime weighed in favor of finding an independent basis for the in-court identification.

seen defendant previously, she had an extended opportunity to see him throughout the day of the fire.

In considering all of these circumstances, see *Gray*, 457 Mich at 115, we are not left with a definite and firm conviction that the trial court clearly erred when it denied defendant's motion to suppress because the testimonial record made at the first trial established that Owens had an independent basis for her in-court identification. See *McDade*, 301 Mich App at 356.

## IV. JURY INSTRUCTION

Lastly, defendant argues that the trial court erred by denying his request for a jury instruction based on his defense theory that evidence admitted at trial indicated that White was the actual perpetrator. Even if the trial court erred, reversal is not warranted.

## A. STANDARD OF REVIEW AND APPLICABLE LAW

"Claims of instructional error are generally reviewed de novo by this Court, but the trial court's determination that a jury instruction is applicable to the facts of the case is reviewed for an abuse of discretion." *People v Dobek*, 274 Mich App 58, 82; 732 NW2d 546 (2007).

"A defendant in a criminal trial is entitled to have a properly instructed jury consider the evidence against him or her." *Id.* It is the trial court's duty to instruct the jury on the law applicable to the case. MCL 768.2; *Dobek*, 274 Mich App at 82. "Jury instructions must include all the elements of the offenses charged against the defendant and any material issues, defenses, and theories that are supported by the evidence." *Dobek*, 274 Mich App at 82. See also *People v Riddle*, 467 Mich 116, 124; 649 NW2d 30 (2002) ("When a defendant requests a jury instruction on a theory or defense that is supported by the evidence, the trial court must give the instruction."). However, an instruction must be supported by a rational view of the evidence. *People v Pinkney*, ___ Mich App ___, ___; ___ NW2d ___ (2016) (Docket No. 325856); slip op at 9.

"Even if the instructions are somewhat imperfect, reversal is not required as long as they fairly presented the issues to be tried and sufficiently protected the defendant's rights." *Id*. (quotation marks and citation omitted). Additionally, in *Riddle*, 467 Mich at 124-125, the Michigan Supreme Court explained:

> [I]f an applicable instruction was not given, the defendant bears the burden of establishing that the trial court's failure to give the requested instruction resulted in a miscarriage of justice. The defendant's conviction will not be reversed unless, after examining the nature of the error in light of the weight and strength of the untainted evidence, it affirmatively appears that it is more probable than not that the error was outcome determinative.

## B. ANALYSIS

It is unnecessary to determine whether the requested instruction was supported by a rational view of the evidence. Even if we assume, without deciding, that the trial court erred by failing to provide the instruction, the error was not outcome determinative.

Defendant's defense theory that Smith started the fire was clear from defense counsel's arguments and questioning of the witnesses during the trial. However, the evidence negating this theory was overwhelming. Although one officer observed that White ran, while on fire, from the burning building—which, according to the defense, demonstrated consciousness of guilt—White testified that he was not fleeing the scene, but, instead, was trying to escape from the fire and save his life. Law enforcement officers testified that it is common for individuals to run away from a burning building and common for people burned in a fire to run for cover. Additionally, Chief Charles Simms also testified that the officers' reports to him did not "give any type of inclination that [White] was running from them." When White was ordered to come out from some bushes (in which he had been rolling in order to extinguish the fire on himself), he followed the order.

Additionally, although a medical report stated that White's primary complaint was, "I burned myself," White testified that he did not make that statement in an interview, and the other, more detailed medical records explained that White reported that someone set fire to the building and White thought he was the target. White's injuries also were consistent with his description of his escape from the apartment building. Specifically, his burns were consistent with a defensive posture, and the presence of carbonaceous staining on his mouth was consistent with running in a burning building and inhaling smoke. Further, Chief Simms testified that White's burns were not consistent with someone who set a fire. Normally, people he has arrested who have set fires have lower-extremity burns.

Chief Simms also testified that White was never a suspect in this case. There was no physical evidence that the fire was ignited near Andrews' apartment, where White had been present immediately before the fire. In addition, Chief Simms testified that paramedics customarily alert the arson department if they transport someone who smells like gasoline, and the paramedics made no such report about White.

It is noteworthy that defense counsel expressly argued during his closing argument that it was likely, based on the prosecution's evidence, that White started the fire. Subsequently, the trial court instructed the jury that defendant enjoyed a presumption of innocence and that the prosecutor had the burden of proof. The jury was told that "[t]his presumption continues throughout the trial and entitles the Defendant to a verdict of not guilty, unless you are satisfied beyond a reasonable doubt that he is guilty." The trial court instructed the jury that defendant was not required to prove his innocence or "to do anything."

Despite defense counsel's closing argument and the trial court's instructions, the jury still found defendant guilty. Given the overwhelming evidence against White's guilt, defendant cannot establish that it is more probable than not that any refusal to provide the requested instruction concerning his defense theory was outcome determinative. See *Riddle*, 467 Mich at 124-125.

## V. CONCLUSION

Defendant has failed to establish that any of his claims on appeal warrant relief.

Affirmed.

/s/ Michael F. Gadola
/s/ Karen M. Fort Hood
/s/ Michael J. Riordan